May it please the court, Robert Harrington, pro bono counsel on behalf of Charles Byrd. I also wanted to bring the court's attention, former pro bono counsel Jarrett Green is also in the courtroom today. This case involves a fundamental Fourth Amendment right to bodily privacy for pre-trial detainees. Here we have a pre-trial detainee charged with identity theft who was subjected to a non-emergency physical strip search under threat of force involving, the search itself involved direct contact with the genitals. It was conducted by a person of the opposite sex. The person conducting the search was wearing civilian clothing, and it was performed in front of a room full of people. Estimates are around 100 people. Well, counsel, if we're conducting a search of the entire unit, and there are 90 inmates in the unit, am I correct from my reading of the records that the inmates outnumbered the correctional officers 2 to 1 at the time the search was done? Yes. Yes, that is inaccurate. And it was necessary to evacuate all of the inmates from their cells in order for other teams to search the cells simultaneously? That is an inaccurate statement of the record. There were SWAT teams that were assigned to clear the pods. All of the 90 inmates for the pod were ushered into the record is they were actually in their cells, minding their own business. The SWAT officers entered with taser and pepper guns, instructed them to disrobe down to a pair of boxer shorts, which by dictate of the Maricopa County Sheriff are pink in nature. It's a thin material. They were then ushered at taser point, for lack of a better term, into a large room, a day room. They were then instructed to stand, not move, shut the F up. The search was then conducted. When they entered the room, all of the 90 inmates that were there, there were correctional officers there, uniformed, both male and female. And the reason for all of this was because of what, intelligence information, that there was an increase in contraband and fights? The record, I'm sorry. Go ahead. Yeah, the record, that is actually, that is correct. The record tells us that the explanation given for this search was an escalation in reports of contraband and fighting. And you've got a jury finding that basically there was a legitimate emergency or reason for the search? We have at least two jury findings that are relevant here. One of them, my understanding of the jury finding is that the search conducted by the female cadet, Cadet O'Connell, was not in and of itself inappropriate. That determination was made based upon a jury instruction asking the jury to find whether or not the cadet had needed or squeezed genitalia during the search. So from that we can conclude then that she conducted the search in a professional manner pursuant to the jail policy, which was to use the back of her hand and so on, that she was working around the groin? I think we can conclude that it was conducted in a professional manner. I'm trying to remember exactly whether the policy, which is D.H. 3, Maricopa County policy D.H. 3, indicates specifically that the back of the hand is supposed to be used, but it's in the record. And at this point we don't dispute that that is, in fact, how it was. These were trainees, right? Cadets, yes, Your Honor. And you concede, I believe, that under certain circumstances, female guards may strip search, I mean, call it a strip search, call it this kind of search, conduct this kind of search of male prisoners. Do we concede that? Under certain circumstances. A stake under emergency circumstances that may be appropriate. Under certain circumstances. Yes, there are certain circumstances. Okay. I would characterize them as emergency, but there are certain circumstances when it is. Why are you arguing with me? I'm sorry. Go ahead. I apologize. You concede that under certain circumstances they are allowed to do it? Yes. Okay. How do they get trained to do it? How do they know how to do it if they don't, do they have to wait for an emergency to arise before they get their training? They have to sort of just happen to be there and then it's an emergency to send them in and say do for the first time? How do they get their training? The record, I have to answer that question directly, which is I don't know how they get their training. The evidence, the record. Let me turn it around. Don't you think that it's a legitimate interest that the sheriff has to make sure that when female officers do need to search, do this kind of search on a cross-gender basis, that they be properly trained so they don't squeeze when they're not, you know, do their thing, and that, therefore, in a training exercise, that they be supervised and they conduct it when it's not an emergency and they can be corrected and supervised? Two points. This is not, the record indicates this was not a training exercise. That was actually the testimony from the defendants at trial. This was not a training exercise. The only reason given for this search was a security interest. Because they needed more people in order to protect the search of 90 inmates, is that correct? The testimony was that there was inadequate personnel to conduct the search on an en masse basis. So we're basically bolstering the normal jail detail that would otherwise be assigned to that unit? That you're bringing in all the cadets so that they can assist with the uniformed officers, yes. What is the relevance to your argument that the person who conducted the search was not in uniform? You stressed that in your opening comments. But would that have made any difference had she been in uniform? Yes, Judge, I believe it would. The Bell test, which is the relevant test, Bell v. Wolfish, instructs courts to essentially employ a balancing test that balances the circumstances of the search and the particular invasion of constitutional right here, the Fourth Amendment right to bodily privacy, with the circumstances, the place, and the scope of the intrusion. And here, part of the analysis depends upon the manner in which this search was conducted. It was conducted by an ununiformed officer when there were uniformed officers in the room. And there are, I'm sorry, an ununiformed cadet, which, as far as my client knew, was a civilian. They were in T-shirts and jeans, no name tags, no other identifying information. And the record indicates that there was no information given to the detainees at the search that these people were, in fact, associated with the jail at all. This is also being videotaped? The record is somewhat squishy on that point. It is undisputed there was a camera, a video camera, in the room approximately 30 feet from where Mr. Byrd was standing during the search. The plaintiffs contended that there was videotaping. The defense contended there was not videotaping. I don't think we have an absolute determination one way or the other. And another question. The question about training came up. I'm curious. You said this was not a training exercise, but was there any evidence in the record as to whether these cadets had ever been trained to do a female-to-male or female-on-female, for that matter, search where they would be searching the genital area? My understanding is there was testimony, yes, that the cadets did receive training on this policy as part of their cadet training. Right. But I guess my question, there was some implication that perhaps this might have been a training exercise, but it's not clear to me why cadets would have to be trained on real prisoners as opposed to be trained on each other if they wanted to do it that  Well, actually, Your Honor, two points. One, one could envision using a mannequin, which was actually used during trial, to demonstrate how these searches were conducted. So you can envision doing training that way. And, yes, the record does indicate that Cadet O'Connell was trained during her cadet training on searching her fellow cadets, including male cadets. And I believe there was some testimony from her that even when they, meaning the other cadet, knew that this was coming, she granted that it was a very uncomfortable thing, even in that circumstance, for cadets to have her searching his genitalia. And I believe in that circumstance he was fully clothed. However, we do have a jury finding that the search was performed for an identified security need, correct? No question. There was an identified security need, which was that the increase in the reports of contraband. There was no finding that there was an emergency situation, was there? Absolutely not. There wasn't even any evidence on that point. In fact, there were reports of contraband. There was no indication that at this instance the search had to be undertaken or that anyone was in any imminent harm or threat. But Bell doesn't require that, does it? It just requires that we find there was a legitimate peniological purpose. And we have a jury finding, as Judge Smith just asked you, that there was a legitimate security purpose for the search. So under Bell, isn't that good enough? Judge Talman, in terms of good enough, no. Bell is a balancing test that requires courts to analyze the nature and the scope of the intrusion, which Ninth Circuit authorities have found searches similar to this one to be of the utmost intrusiveness. We have ---- But that goes to the other side of the scale. The question I'm asking is under Bell, as I understand the test, if we found there was no legitimate peniological purpose, you win. But here we've got a jury determination that there was, that there was a security concern. So if that's the case, then why shouldn't we also follow the command and tell that we defer judgment of the, in this case, the sheriff or the jail commander, as to how that legitimate security interest must be addressed with this type of a search? Because the language in Bell specifically requires that we look to the particular nature of the search. We have a finding of a legitimate security interest, that is a given. We need to look, though, at the particular nature of this search, cross-gender, in a room full of people, by a cadet in civilian clothing, at under force. Did Bell involve pretrial detainees? Yes, Your Honor, it did. It did involve pretrial detainees. When ---- based upon that, I think if you look at Judge Reinhart's concurrence ---- granted it's a concurrence, but in Jordan, Judge Reinhart, which the majority found was an able analysis under the Fourth Amendment, he's looking to the specific nature of the search. So it was cross-gender. We need to look at that. We need to look at the fact that it was done by a cadet in civilian clothing. How much, how much of a change would be necessary? How much of a burden are we placing on the legitimate identified security need of, admitted of the Maricopa County by requiring at least some type of accession or just taking into account the privacy interest of the inmates? Does the record show how much longer it would have taken to search this group had only the officers been given the task? No, it does not. There were 10 to 15 uniformed officers in the room, and then there were, I believe, it was 25 to 30 cadets. I'm assuming it's going to be a ratio. Perhaps the officers are faster at doing the search, and that's actually a fair point. One of the factors that we look to in terms of the penealogical interest here is since we have a security interest that's being raised by the government as the justification for this type of search, what would be the, having uniformed officers might be the best way to further that interest. I think there's a legitimate. But the jail commander says he doesn't have enough uniformed officers. I mean, as I understood it from your prior answer, he called in help because he's got to search 90 inmates in the pod, but he doesn't have enough on-duty uniformed jailers to do it. So he's got to augment his staffing. And your argument, as I understand it, is okay, that may be fine. He has to augment his staffing. But what he really needs to do is to break his workforce down so that even though a third of his staff are in the pod, he's not going to be able to search 90 of them at the same time that he's shaking down cell. I don't think that the latter part of that is exactly my argument. I would say it slightly differently. I would say that the Maricopa County Sheriff needs to make some sort of or set up some sort of protection for the legitimate, I think, constitutional privacy interests of Mr. Burke. There's really no effort here other than allowing them to remain in their box of choice. Counsel, I thought I read somewhere in the record that there were uniformed officers who were not participating in the search, who were just watching while the cadets performed the search. That is absolutely correct. There were 10 to 15 uniformed officers, including male officers, including a male officer standing 10 feet away from Mr. Burke, who were available to perform this search on this specific occasion. One can imagine a situation where the – without any kind of major imposition on the government, one would simply ask the inmates who are standing – I'm sorry, not inmates. They're pretrial detainees. They've not been convicted of anything yet, whether or not they would object to being searched by someone of the opposite sex or somebody who is a cadet. It takes very few seconds to utter, and the person can either give their assent or not, and there are people right there who, at least in this circumstance, could have been available. But isn't one of the concerns here that we don't want inmates passing contraband off from one to the other? I mean, we've got 90 people that are milling around now in a day area, plus another 30 to 45 correctional officers. That seems to me a pretty high-risk situation for things to get passed from one to the other that might or might not be seen. Just to clarify the record, the record is that the pretrial detainees and other individuals from this pod were ushered into the room and required to sit along the wall facing the wall until they were called to stand up and be searched. And that was the manner in – I'm sorry, Jeff. How many were being searched at any one time? I apologize, I don't know. There's more than one, right? We weren't singling out Mr. Bird so that all the other 89 inmates could look at him while all the other correctional officers looked on. And everybody was doing different things. There were more than one. There was more than one pretrial detainee being searched. Was it five at a time? Thank you. Yes, Judge, it was five. They weren't milling around in any of them. No, they were not milling around. My point I was trying to make was simply that they were required to sit down against looking at a wall. What relief are you seeking? Actually, I was going to close with this point, but the trial judge has given us an indication of the relief that we would seek and that should be granted in this case from our perspective. This is at page 87 of the record. The trial judge made this finding the day after he granted the Rule 50 motion in favor of the defendant, Sheriff Arpaio. This is at lines 9 through 21. Again, record page 87. Actually, before we go through this, there's something I did want to put on the record for the sake of clarity. My ruling in favor of Defendant Arpaio, that really was a ruling on the general constitutionality of what I will describe as the, quote, male-on-female underwear pat-down, end quote, search, as a matter of routine without exigent circumstances. I'm of the view that if this is appealed and if the court of appeals concludes that I misread their precedents or if they improve on their precedents, then the plaintiff is entitled to judgment of liability on that point. I don't see any need for any proceeding on remand to determine liability, so I just want to have a clear record in case it goes down in that direction. So we would be asking for a finding of unconstitutional, that this search was unconstitutional, violated the Fourth Amendment, and that liability, that the district judge being directed to, consistent with this statement, directed to enter a finding of unconstitutional. Did you make a motion for a Rule 50B in your favor? I'm virtually certain that there were cross motions for Rule 50. So you would want us to conclude that he should have granted your motion for a Rule 50 on the constitutional question? On the constitutional question and just as to liability, yes, Judge. And it would go back for damages? Correct. What about the equal protection argument? At this point, Judge, and in terms of how we briefed the request for en banc hearing, we are prepared to submit on the briefing in terms of the en banc argument, particularly with regard to the finding. I understand the panel's opinion can't be cited, but the panel basically found on the equal protection point that there was a failure of proof with regard to Jordan, and that whether or not there was males and females were in the same situation and whether or not there was an intent. At this point, we submit on the briefing on that point. And I think there is a basis in the panel's opinion to make that finding. Let me add a couple of things. I'm sorry. That's why I'm focused on the Fourth Amendment issue. There are a couple of questions I have. Based on your idea that this is not a uniformed person, what do I make in the record that the cadets all wore jeans and white T-shirts with names on the back of them, that they weren't just guys standing in there in street clothes, that they had a given uniform per cadet? The first part of that question I didn't catch, Judge. I'm sorry. What do I make of the idea, since you're arguing that uniform, non-uniform, is of some significance of the ideas I read the record, the cadets were all in jeans, white T-shirts, and the names on the back of them? That is the way the record was generated. They were in civilian clothing. Well, you call it civilian, but I mean, I'm around scouts every day. Then I don't want to be pejorative or characterize it in any way. Each one was in jeans, tennis shoes, and a white T-shirt. And names on the back. I have to admit that I don't know whether my client knew that or saw that. The record is undisputed that he didn't know who these people were, and it was not explained to him. And I think that is a significant factor. I still don't understand why that matters. It matters because it goes to the overall reasonableness of this search. It goes to the overall reasonableness because there is a difference from our perspective between having a government official who is charged with your safety and security being the one who is searching you, as opposed to, as far as you know, could be someone off the street. Well, this is some kind of sick, hazing thing. There's no explanation here provided to these people. Do you think somebody just wandered off the street and started doing this? Of course not. There's got to be a reason. No, no, not of course. I mean, that's what you said. What I am saying. What do you mean by off the street, if not that? He had no idea who these people were. That matters because. What does it matter whether he knew or not? Because it goes to. Do you have any doubt that these were there under the authority of the jail? He did not know who they were. He did not know. I don't know if that is in the record, whether he knew they were under authority of the jail. He testified, and the record is clear, he did not know who they were, and it was not explained to him who they were. Either they wandered in without authority of the jail, or they were there under the jail authority. Maybe he had deputies standing around watching. Or someone in his position is left in a position to wonder and speculate as he's about to be subjected to a female searching his private parts without his authority. I think it goes to the overall reasonableness of the nature of the search. It would have been very simple for the county to have made a general announcement. These are cadets. They are in training. They are not officers. They are affiliated with the jail. They are authorized by the state to come, sorry, by the county to conduct these searches. That's a few words, not very much oxygen, and it would have provided the disclosure and alleviated that concern. In our view, it is relevant. I see I'm having eight minutes left. Let me ask you one more question. This is a 1983 claim, correct? Yes, Judge. And it seems to me that you're really focusing on the first prong. In what sense, Judge? Well, this is a constitutional violation. Has there been anything ever argued or suggested as to the second prong of the test? You have to forgive me, Judge. I'm not specific. Was there ever a claim for qualified immunity? There is no claim for qualified immunity in this case. No claim. That's what I wanted to make sure of. Yes, Judge. And that is in the pretrial order, which is at the excerpts of record, page 40. It contains the defenses and legal issues. I wanted to make sure of that. Sure. Again, there's about seven and a half minutes remaining. I'd like to reserve that for rebuttal. Okay. We'll hear from the County. Good afternoon, Your Honors. Eileen Gilbride for the defendants in this case. Your Honors, the policy in this case, DH3, needs to be viewed as written. When we view it as written, and that means distinguishing a strip search from a frisk search, we come up with two truths. Do we disregard how it was implemented? You said view it as written, so do we disregard the implementation of the policy? No, we don't disregard the implementation of the policy, but the jury has found that the strip, that the, I apologize, the frisk search was conducted professionally and properly and for legitimate security reasons. And so if we're talking about the reasonableness of the policy, talking about two things here. First, the office, the sheriff's office has used its expertise and weighed the privacy concerns of the inmates and the institutional need for security. And it determined that while female officers can conduct over-the-clothing pat searches, they cannot conduct strip searches of males, and they cannot conduct visual or other body cavity searches except in emergencies. And the administration's balancing of these competing interests is entitled to substantial deference. And so when counsel says that the sheriff's office hasn't given this a second thought, that's not true, because females can, there are, there are circumstances when cross-gender searches cannot be conducted, and strip searches is one of them. Pat searches they can do, strip searches they cannot. Do you characterize this as a pat search? Yes, this is a pat search. Let's see. If I understood the record, he was, he had to take off his outer clothes, correct? Correct. He had to take off his shirt, his pants, his socks, and his shoes. That's correct. Right? Right. So he's down to his boxer shorts. That's right. And that was it. Yes. And what ensued, the search that ensued, you characterize it simply as a pat search. That is how it's defined in the policy, DH3. He's asking you what happened, not how it was defined. Yes. She searched over the boxers, which is how the pat search is defined in the policy. She manipulated his genitalia. No, she didn't. And the … She didn't put the back of her hand, move his scrotum to one direction or another? As she was searching, she has to, as she's searching with the flat hand as so, with the thumb extended, as she's searching the inner thigh, yes, the back of the hand needs to move the scrotum out of the way so that she can search the inner thigh. Okay. Move as opposed to manipulate. I think that's a big difference. All right. And this isn't a matter of semantics, Your Honor. The pat … It's not semantics. It's a question of what physical contact there was. A strip shirt can be visual. The policy, as I read it, says female inmates will only be searched by female officers absent exigent circumstances. Male inmates may be frisked, searched by either male or female officers. Exactly. Strip search, anybody can do a strip search? No, females cannot do a strip search on a male because that is … And what's a strip search? Strip search is … It's defined in the policy … Well, I want you to tell me. I want you to just tell me what … Strip search is completely unclothed, visual, a body cavity search, and a visual search of the male or the inmate. So … Go ahead. No, I should say, so under the policy, a strip search encompasses a body cavity inspection. It may, yes. It may, not always. Yes. The policy says it may include a body cavity, a body cavity search. I can read it to you. I have it. The strip search is defined, and I encourage you to look at DH3. The policy, it's at ER 857. A visual scan of the inmate's skin after all clothing has been removed. A strip search may include a visual body cavity search. Okay, but … Females cannot do that on males. Is it your position that as long as an inmate is clothed at all, there is no strip search? Yes. That is my position. That is what … If the inmate was only wearing socks, there wouldn't be a strip search? I think that would be a much closer, harder question because then there would be a visual … It would be a visual scan, if you will, of the inmate, of parts of the clothing that are not normally exposed. That's what a visual … But I don't understand the distinction you're making, but I don't understand why it is considered less intrusive to look at someone's genitalia than it is to be touching the genitalia through some thin fabric. I don't really understand why, as a policy matter or as a matter of anything else, why that is considered significantly less intrusive. The policy is not … The policy is that any clothing, so it could be the full jail pajamas, it could be … I know that, but that's not this case. So why is this less intrusive than looking without touching? Because, I guess I have to say in my view, this is much more like the casual, sometimes observance that was upheld in Grumman. This is not … Okay, now let me, before you proceed down that road, can I just bring you back to your policy? Yes. I'm getting a little confused with your terminology. A frisk body search … Yes. … is defined in the policy as carefully examining an inmate by inspecting his clothing and feeling the contours of his clothed body … Correct. … and so on and so forth. Yes. Then you go over, and the part that I was reading earlier, male inmates may be frisk searched by either male or female officers. Right. Female inmates will only be searched by female officers. Yes. Is that not because touching is an intrusion that the policy recognizes would be offensive to women being felt through their clothing? I think it's an acknowledgment that typically women have much, much more of a chance of … women inmates have much, much more of a chance of having been sexually abused, raped, things like that. And we find that in the language of the cases. Even the Jordan case says where there was psychological testimony from the psychological experts that said that women had these strong reactions to being touched by the male officers. We do not have any kind of that evidence in this case or any other case that males have the same kind of reaction to female searching. And so there was no evidence in the record as to why the policy is the way it is, but I think what we need to focus on is the fact that the sheriff's office has given thought to the inmates' privacy concerns and has made a decision that it needs females to help frisk search, pat search all of these … So this is a sexually discriminatory policy? No, it's not. What would be sexually discriminatory is to not allow the female officers to do what the male officers do. And that's the Ting case. That might be true, sexually discriminatory, too, but I don't want to talk about that. I want to talk about our case. Yes. And I hear you saying this is a sexually discriminatory policy. You can explain to me why it's not, not tell me what something else is. It's not. This kind of policy is if you're a male inmate, you will be subjected to a cross-gender tactile search of this kind. Yes. Which means that the female officer will be able to touch your scrotum with the back of her hand. Yes. On the other hand, if you are a female inmate, there will never be a situation where a male officer will touch your breasts, let's say. Breasts and armpits and, of course, thighs are all places where female officers can, I'm sorry, female inmates could conceal contraband. And I assume that those areas are searched at times, but this would never be a situation where if you're a female inmate, you will ever be touched there by a male officer. Absent an emergency situation, that is true. Right. Let's just put the emergency to one side. Right. So just listen. So that's the policy. So how is this not a sexual discriminatory policy? Two answers to that. Just one will do, a good one. I have to have two. First, there is no Why don't you start with your best, and if it's good enough, maybe you won't have to get to this. I think I'll probably need to. There's no equal Then maybe you need three. If I had three, I would use them all. But there is no equal protection in this claim in this case. I'm not saying equal protection. I'm not even saying it's a violation of the law. I'm asking you a question whether it's sexually discriminatory. I state it as a fact, and you argue with me about it, and I am baffled that you would take a policy that obviously discriminates, treats female prisoners different from male prisoners, and you say it's not sexually discriminatory. I'm still trying to get that through my mind. It does treat So explain it to me. I will. I'm not saying it's illegal. I'm not saying it's improper or anything, but you're saying it's sexually equal, right? It's not sexually discriminatory. It's not discriminatory, but it does not treat them the same either, because there is a difference. I'm sorry. How does something that just treats people differently not be discriminatory? Do you understand what discriminate means? Maybe I don't. Maybe we're using different definitions of it. Discriminate means you make a distinction between two things differently. I agree with that. Okay. I agree with that. They do So this is – okay. So if you don't like the term discriminatory, this is a policy that treats people differently based on sex. Yes. And you think that's – Disparate. Disparate. It treats them differently because of the difference in the genders, yes. Okay. Yes. So let's throw aside the term discriminatory. Thank you. Now, so do you think a policy that treats people differently because of sex needs to be justified in any way? Does it – is this just like any other policy, or does it require any kind of heightened – Yes. Or is it just like the decision whether to have them wear pink underwear as opposed to blue underwear or as opposed to yellow underwear, which is, you know, just one of those things? Is there any burden when you treat prisoners differently on account of their sex, does the institution have any burden to justify that beyond naked rationality? No, I think the Turner analysis applies, regardless of – Turner versus Lafley? Yes, to the reasonableness of the policy, as long as there is a legitimate penological reason for the policy. Okay. So what's the legitimate penological interest of treating women differently from men? They don't have enough male officers to search 900 or 10,000 male inmates. They do have enough female officers to search female inmates. So is that right there? That's your justification for saying women never, except in emergencies, and men, okay? Yes, certainly. It is simply – but why wouldn't that simply sort itself out if there are not enough? You would say, well, sometimes men would do this and sometimes, you know, it would fall out the way it does. Why do you have to have a never policy as to women? What do you justify the sort of never policy as to women? That's how it was justified by Captain – What's the penological interest? The jail needs to have enough officers to conduct these searches for the safety and security of the inmates and the officers. Can we come back to the underlying justification aside from the need for person power? You said that there are studies that show that women are more likely than men to have suffered sexual abuse and therefore be psychologically impaired if they are searched by a male. That was from the Jordan case. No, I – I'm sorry, Your Honor. I know the Jordan case. I'm asking about your policy. Yes. I thought you said that the policy was adopted after careful thought to recognize these studies that said maybe I misunderstood you. That is not in the record. When asked what is the reason for this policy, Captain Peterson said he didn't know and Sheriff Arpaio said he didn't know specifically. But if we're searching for whether or not this policy is reasonable under the Fourth Amendment, these are factors that can be used to justify its reasonableness. All right. So the fact is that the case law recognizes there may be external factors that affect women, but that same research does not rule out that individual men may be equally affected by it. Certainly. There's no evidence that in this case a person who is being searched as a pretrial detainee who was, as I understand the record, I understand that he was abused himself and that that is why this was particularly offensive and degrading to him, standing in pink underwear in front of people in the circumstances that have been described by a person who, a woman who is wearing a white T-shirt and jeans and rubber gloves and then comes in intimate contact with him. Why doesn't he have an individual right to the consideration that you say are given to women as a class? Because when we're looking at the reasonableness of a policy under the Fourth Amendment, we don't judge that by individual inmates' sensibilities. So that if it is recognized that women and maybe fewer but some men might react, we should just ignore and rule out the possibility that the smaller percentage of men who might be equally affected in the negative way women are don't have a prayer in jail because somehow our case law hasn't surfaced that as a potential vigilized kind of harm. We don't ignore that. But there was no evidence in this case that males as a class are affected the same and as extremely as the evidence was in Jordan that affected the females that way. And without the evidence that males as a class have a problem with this kind of a policy, with the strips with it. Well, how many males have to have the problem before it becomes an individualized right? Well, I don't know, Your Honor. But there's no evidence in this case that it was a problem for anyone except him. And we don't judge the reasonableness of the policy under the Fourth Amendment by an individual inmate. We judge it on the objective, whether it's objectively reasonable under the Bell test and under the Turner test. And certainly the jury found that this was reasonable in terms of scope, in terms of the manner, the way it was conducted. And then we go to the two tests. So you read Bell and Turner saying we look to hypothetical, phenological interests? No, but it's not. They don't actually have to assert it in the case. We can just guess at what they are based on case law? Either that or from evidence. No, I'm asking a question. Well, but there's no evidence in this case, right? Exactly. Exactly. And so we either don't. Wait, wait, wait, wait. You said that they have to justify it under Turner on a valid penological interest. Yes. And then you tell me, and in answer to Judge Fisher, as I'm listening to your answers, is there is no evidence. There's nothing at all in the record to justify it based on penological interest. Why don't you lose at that point? Because you needed to provide evidence of a penological interest? No. You didn't? No. What I'm saying is that the plaintiff didn't provide any evidence that this reasonable search was unreasonable from a legal standpoint. You provided evidence that this was a sexually disparate search, to use the term you like, that men and women were treated differently. So I ask you, can they just do that just like picking pink underwear for inmates? Yes. Is this one of those things that's unreviewable, just a matter of a mistake of discretion? He says, no, no, no. It has to be justified under Turner as having a legitimate penological interest. Yes. And so I'm wondering what that is. And you said there's no evidence in the record of any legitimate penological interest, right?  There's no – no. What there's no evidence of is that males are adversely affected the way females are affected. How do we know females are adversely affected? Is there evidence of that in the record? It's from the Jordan case. No. There's not. So there's no evidence in the record. You have to go to case law. Yes. And I'm asking – the question I'm asking is can you rely on case law for – you have asserted, not simply conceded, you have asserted that you need a legitimate penological interest.  I've never seen a case where there's no evidence in the case of a legitimate penological interest where you have to go to other cases to find that evidence. There is evidence in this case of a legitimate penological interest. And that is the need for – For treating men and women differently? Yes. The need for – to have enough officers to do the searches. There aren't enough – And that was asserted as the reason for this? Yes. Yes. I want to ask you, if I may, about the limits of your argument – Yes. – that the plaintiffs have to have essentially expert testimony if there's a class-wide versus an individual interest. And I'm not really sure how – where that comes from and how far it goes. If the issue were there's a policy that everyone is searched at gunpoint and there's a loaded gun, do you have to have an expert to say that that's terrifying or, you know, in an emergency? No. Where does common sense come in that people don't like to be felt through their genitals, felt through their underwear in front of 100 people? I'm not sure why you need an expert witness about that. Well, because, again, we don't determine reasonableness of a policy based on the sensibilities of one inmate. Officer O'Connell testified – That's my exact point. Isn't it just common sense and common experience that doesn't require an expert to tell us that it isn't just one person who finds this embarrassing, humiliating, bizarre, uncomfortable, or whatever adjective you would like to use? And maybe there's a justification anyway, but I find it odd that, you know, your I just find that, you know, unless you have expert evidence, and I just find that a very odd argument. I speak only for myself. It's actually in the record, Your Honor, because Cadet O'Connell was asked, how many of these searches have you done cross-gender? And she says hundreds. And she was asked, has anybody ever complained before? That doesn't mean that they didn't find it objectionable. In Joe Arpaio's prisons, do people feel really comfortable about voicing opposition to prison policy or jail policy? Your Honor, I don't know. I can't answer that. I don't think people are necessarily comfortable in any jail anyway, for any reason. Counsel, am I correct? These arguments were made to the jury in support of his claim, correct? I mean, is this an issue that a jury needs expert opinion on? Why can't laypersons apply their own common sense and life experiences to the question? If we're talking about the reasonableness of allowing females to do pat searches on males, in Jordan, one of the main reasons they found it unconstitutional was because so many women had so many adverse reactions, and the jailers knew about it, and they did it anyway. And there was evidence that that was just unreasonable because so many of them had a problem with it. We don't have any evidence of that in this case. And in Jordan, it was an Eighth Amendment case. Yes, yes. I was going to say, in Jordan, it was an Eighth Amendment case, and they had to show some kind of intent or deliberate indifference, and that's why it was important, and that's why this is a different test here, as I understand it. Well, that is the intent part of it, that the fact that they knew about it and did it anyway. But the fact that the court went on extensively at the beginning on this testimony about how females were adversely affected by this, the psychological aspect of having them be pat searched. And we don't have, when you're talking about the reasonableness of a policy, we have to go on reasonableness as a global term, not reasonableness according to Mr. Byrd. Well, this was just a, as I understand it, this was not an attack. This is not a class action against the policy itself. This was an individual case where he claims or he asserts that his Fourth Amendment or Fourteenth Amendment due process rights were violated by this particular search. Only, well, all we have at issue here is the cross-gender nature of it, because everything else the jury found appropriate. No, I'm just saying what his claims were. Yes. So can you explain to me how the policy is before us? How the policy, because it's the cross-gender nature of the policy that allows, allowed the female to search him, whether that was reasonable or unreasonable under the Fourth Amendment. He wasn't asking for, he's not, he didn't, I may be wrong, and you can correct me, please do, but I don't think he was asking for injunctive relief to enjoin future cross-gender searches of this nature. But he is asking for the Court to hold the policy unconstitutional, which was. He's asking, yes, he's saying this search is unconstitutional. Well, there were other people standing around who, watching. The only other people, the other officers that were there were the supervisors of the cadets. And Cadet O'Connell testified that they were there protecting, for the protection and the safety of the cadets to make sure that everything was being done correctly. It's not like they were standing around doing nothing. So. It was the situation that day. It's here. Yes. Yes. Let me ask you a question. Are the public entities subject to suit here under both the Eighth Amendment and the Fourth Amendment? I understood their position to be only under the Fourth Amendment, that they were not raising a Fourteenth Amendment. No, I said the Eighth Amendment. Well, he's a pretrial detainee, so it would be the Fourteenth Amendment. I mean, are the public entities on, is an action brought against both public entities, the jail plus the sheriff or, excuse me, the county, on both the Eighth Amendment claim and the Fourth Amendment claims? They raised them initially. They raised an Eighth Amendment claim initially, which the judge considered to be a Fourteenth Amendment claim because he's a pretrial detainee. Okay. Which it's the same analysis, but. I understand that. But I'm just asking, are the public entities, are they, does he seek relief against both public entities under both theories, the Eighth or Fourteenth and the Fourth? I understand him to be raising only the Fourth Amendment issue now. I could be wrong, but he said nothing in his, in his, in his rehearing memorandum about the Fourteenth Amendment. And, indeed, there's no evidence in the record of any subjective, of the subjective prong of that analysis, that it was done for malicious intent and things like that. Well, we just take over the, as the Envine Court, we just take over the case and whatever issues he raised in the Blue Brief are before us. And he may, but there is no evidence of the subjective prong. And so I would say that the Fourteenth Amendment issue is out since the jury, especially because the jury found that there was a legitimate penological purpose and that it was done correctly and in a professional manner, that gets rid of the subjective part of the Fourteenth Amendment analysis. And they have not appealed any of the jury findings in that, in that sense. I would like to say with my two minutes left that Plaintiff has said in his, in his rehearing memorandum that this policy is not constitutional under the cases of this circuit and the other circuits. Yet all the circuits, all the cases that he cited were strip search cases, body cavity inspection cases, and arrestee cases, where strip searches and body cavity searches were done without reasonable justification. That isn't what we had here. There are five pat search over clothing cases that say this, that indicate that this Pat search over clothing. Pat search over clothing. Over clothing. Not. Don't. Look, you just said, oh, his cases are off of, because they're all strip searches. Yes. Which means that they had their clothes entirely off. In this case, you salvage because you jump to the pat down clothing cases because he happened to be wearing a pair of boxer briefs. That's correct. Okay. That's correct. And so all of, all of those cases uphold your policy because they were pat down over clothing. You do pat down during a Terry stop, you know, stop and frisk. There's a big difference between that and doing the kind of frisk search that was done in this case, isn't there? I think we would have to agree to disagree on that, Your Honor, because it's over clothing is over clothing. Whether it's. Even if you can feel the genitalia as if there were no clothing, because. There's no evidence that you couldn't feel the genitalia over the prison pajamas. I don't know how thick or thin those are. Well, we do know how thick or thin they are in this. There was. Yes. Yes. If this were a female prisoner complaining of a male search, would he be taking the same position? Which position that this was, that this was constitutional? Well, it's against, it's against the policy. It wouldn't happen. Well, I understand that. Oh, it could happen. It would be unconstitutional. Oh, it, it would, no. It would be in an emergency situation, I suppose it could happen. Let's, let's say the policy were violated or the policy were different and just hypothetical rather than fighting it. Let's say this were, let's say the policy simply didn't exclude, applied equally to men and women. And this happened to be a, the roles were reversed. It was a female prisoner and there had been a search by a male guard and, you know, he had done the same things involving her private parts. I mean, would, would you be taking the same position? I, I, I don't know the answer to that because the, the genders are different and they are treated differently and they should be treated differently. And so I, I'm not sure how to answer that. Certainly that would be a case a lot closer to Jordan than this case. And so I don't know how to answer that question. You don't dispute Jordan. You don't think we should overrule Jordan. No, I don't think Jordan applies here at all. I think there are so many differences with Jordan that it, that it just doesn't apply. Okay. Thank you. Your time is up. I only have 40 seconds. Oh, am I over? Oh, I'm so, I'm so sorry. Thank you, Your Honor. We'd ask you to affirm the panel. Thank you. I'd like to try to just make a few brief points. First of all, the, the question was asked in a statement by my opposing counsel regarding there being no evidence of why the policy is the way it is in the record. From our perspective, that is a significant fact or a significant concession. I would point the court to the cases, some of which we cited in our brief, but it's the Fuller line of cases. It starts with Giles, Kennedy, Thompson, Fuller, that look specifically at strip searches, generally visual nude strip searches. This was a, this was a jury trial, right? Correct. Did, did you move for a directive verdict or a JNLB based on their failure to provide evidence of a penological interest? On the Fourth Amendment claim, I didn't have time to, or I did not check while I was sitting down, Your Honor, but my answer before was I'm virtually certain, yes, there was a Rule 50 motion filed by the plaintiff's attorney. I'm sorry. I'm assuming that that's the case, the final motion. Okay. I'm asking the specific ground, the ground being that there was insufficient evidence, there was no evidence of failure of proof as to the penological interest. Was that one of the grounds that you presented to the district court? I don't know. I don't know, Your Honor. Did you ask for an instruction that would have instructed the jury that there was an issue, that there was no evidence of a legitimate penological interest for the district policy, then it had to find the policy invalid? Any kind of jury instruction like that that you would profit? The honest answer is I do not know. The jury instruction on, we didn't have an opportunity, in fact, to have a jury instruction on that issue submitted on that issue because it was taken away from us at the end of the case. In terms of the specific Fourth Amendment, cross-gender, non-exigent circumstances, path search over boxers. That issue, as the trial court indicated in the passage I read before, was what he was ruling was constitutional and took away from us. And what was submitted to the jury was, one, whether or not there was an identified penological interest. The jury said, yes, there was. Two, whether or not this specific search was inappropriate because of kneading or squeezing of the genitalia. And the jury found that it was not. In that regard, in this argument that this search was conducted professionally, I would direct the court's attention to some language from the Way decision, which is cited in our papers. The scope of intrusion, this involved a visual strip search. Scope of the intrusion here is indisputably a frightening and humiliating invasion. Even when conducted with all due courtesy, the intrusiveness can't be overstated. I will grant the panel that this search was not a nude strip search. The gentleman, our client, was, in fact, wearing a very, very thin pair of boxers. I would argue that this search was, in fact, at least as intrusive, if not more intrusive, than the search at issue in Way and Fuller and several of the other cases because this is from Gromit. Gromit was a search by a female of a male. And we don't know whether the male had any undershorts on. If he did, then the difference between the valid Gromit search and this would be one layer of clothing. There are several factors that we believe distinguish the past search that was conducted in Gromit. In Gromit, again, the inmate, he was an inmate, convicted prisoner, was fully clothed. He was fully clothed. I don't think the record indicates specifically what he was wearing. I do not. No, you're right. In that case, the decision specifically relies on the, yes, there was contact with the genitalia. It specifically talks about that being brief. Here's the passage on page 496. These searches were done briefly and while the inmates are fully clothed and do not involve intimate contact with the inmates' bodies. Again, that's at page 496 of the Gromit decision. I think that that passage and that description and rationale is getting to the bell factor of the scope of the intrusiveness. But if you're looking for contraband, aren't you going to have to, by definition, look in very private areas where we know historically that such items are secreted? We do not dispute that. You're going to have to look. The question is how you look. Do you take into account, and Bell tells us you have to take into account, the prisoner's legitimate privacy interest, bodily privacy. Counsel, let me quickly ask you. There was much conversation with opposing counsel about the legality of the policy on an ongoing basis. Do I correctly understand the complaint as seeking only monetary damages and not injective relief? That's absolutely correct, Your Honor. We are seeking a specific determination that this search as conducted on the person. And maybe the policy going forward will continue to go forward as far as this lawsuit is concerned. That is entirely possible, Your Honor. The policy actually came into the case as sort of a justification for this search. The defendants brought it in with the explanation that, look, we conducted a past search or, I'm sorry, a first search. First searches are legal, therefore this is legal. That was the syllogism they tried to set up. I think that this policy, I'm sorry, this search was certainly not a first search. This is a case and this is a search that I think is very difficult to put a label on the type of search. It's not a past search. It's not a strict search purely. I think it is a combination of all of those things. And if you look at the specific nature of this first search, it's highly, highly intrusive and conducted under questionable circumstances. I have 40 seconds. I'd like to sum up just by saying that we respectfully request that the panel on the Fourth Amendment issue reverse the panel opinion, find that the Fourth Amendment claim was proven and enter liability on that claim. We believe we've proven that. If the court and the Ninth Circuit precedent, in fact, supports that finding, if the panel does not believe that the Ninth Circuit precedent as it exists supports that finding, I would invoke Judge Fernandez's dissent where he said, when all is said and done, I would not think that it was reasonable for males to strip search females in this kind of situation, and I do not think it was reasonable to have females strip search males. If our law does approve of it, and the majority opinion cogently reasons that it does, I reluct the law should change. Thank you. Roberts. Okay. Thank you. The case will finish in a minute. We are adjourned. Thank you.
judges: Kozinski, Schroeder, Hawkins, Graber, Fisher